Stephanie HOWARD, Plaintiff–Appellant,

v.

Donald C. WINTER, Secretary of the Navy, Defendant–Appellee.

No. 05–1258.

United States Court of Appeals, Fourth Circuit.

Argued March 21, 2006.

Decided May 4, 2006.

---

**ARGUED:** John F. Karl, Jr., Karl & Tarone, Washington, D.C., for Appellant. Dennis Carl Barghaan, Jr., Assistant United States Attorney, Office of the United States Attorney, Alexandria, Virginia, for Appellee. **ON BRIEF:** Paul J. McNulty, United States Attorney, Alexandria, Virginia, for Appellee.

Before WILKINS, Chief Judge, and WILLIAMS and SHEDD, Circuit Judges.

Affirmed in part; vacated and remanded in part by published opinion. Judge WILLIAMS wrote the opinion, in which Chief Judge WILKINS and Judge SHEDD joined.

WILLIAMS, Circuit Judge.

Appellant Stephanie Howard appeals the district court's entry of summary judgment for Appellee Secretary of the Navy (Navy), in his official capacity,[1] on her hostile work environment claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.* (West Supp. 2005). The district court granted summary judgment based on its conclusion that once the Navy was provided adequate notice of Howard's allegations, its response was reasonable. For the reasons stated herein, we affirm in part, and vacate and remand in part.

### I.

We summarize the essential facts of this case in the light most favorable to Howard.[2] Howard is a former employee of the Naval Air Systems Command (NAVAIR) in Arlington, Virginia. During some of her time at NAVAIR, Howard was employed as a group secretary, where her duties consisted of providing administrative services to all fifty-five staff members in the Air Assault and Weapons Division.

One of those fifty-five staff members was Randy McCall, a Logistics Management Specialist. Howard alleges that McCall sexually harassed her between the period of June 1995 to November 1996. Howard claims that McCall often spoke to her in a sexually provocative manner and fondled her breasts, backside, and face. This behavior reached a height on March 5, 1996, when Howard walked over to McCall's cubicle to read his newspaper, as she often did. While she was reading the newspaper, McCall placed his fingers up her dress and inside her vagina. Traumatized and violated, Howard immediately fled McCall's cubicle area.

After the March 5 incident,[3] Howard drafted a letter to McCall explaining that his advances were unwanted and he had gone too far. After drafting the letter, she delivered it to McCall while accompanied by her friend and coworker, William Willard. On March 19, Howard went to speak with Jessica Demaris, who worked in NAVAIR's human resources division. Howard told Demaris that she wished to be

---

1. The complaint named then-Secretary Gordon R. England as the sole defendant. However, during the course of this appeal, Donald C. Winter was sworn in as the new Secretary of the Navy.

2. When reviewing a district court's grant of summary judgment, we construe the facts in the light most favorable to the nonmoving party, which in this case was Howard. *See, e.g., Laber v. Harvey,* 438 F.3d 404, 415 (4th Cir.2006) (en banc).

3. Prior to this March 5 incident, Howard stated she had informed four coworkers of her earlier problems with McCall: Lisa Pace, a NAVAIR secretary who worked in another division; June Mattingly–Bateman, also a secretary; Jorie Henry, who worked for an independent contractor; and William Willard, a military member assigned to NAVAIR whom Howard described as a friend. (J.A. at 85.)

placed on a list to receive placement with another Department of Defense division. When Demaris asked why, Howard told her she was being "assail[ed]" at work. (J.A. at 321.) Demaris attempted to get more information out of Howard, but, by Howard's own admission, she was not "very specific" and did not name McCall. (J.A. at 85.) Unable to obtain much information from Howard, Demaris then referred Howard to Aaron Pendleton, a Human Resources Specialist. (J.A. at 507.) At her deposition, Howard recounted her conversation with Pendleton:

> [Pendleton] said to me, Hey, what's going on? What are you doing here?
>
> I says, I am trying to get the hell up out of here.
>
> He says, Why? What's wrong?
>
> I said this mother–f——r put his hands on me, and I don't like it.
>
> He says, Who?
>
> I said, Somebody old enough to be my grandfather.
>
> He says, Who?
>
> I said, Randy McCall.
>
> He says, I don't know him. He says, This is what you need to do. He says, What you need to do is you need to write him a letter.
>
> I said, I already did.
>
> He says, The next thing you need to do is you need to write down everything else that he, you know, he does to you if he harasses you again. Now, if he harasses you again, you need to let somebody know. You need to tell your supervisor or you need to come back to me.

(J.A. at 322–23.)

Some time later, McCall again began to make inappropriate comments to Howard, but he did not touch her again until November 18, 1996, when Howard alleges that McCall cornered her while she was sorting mail, this time placing his hand on her face, neck, and breast. Howard told her friend and coworker Pace about McCall's behavior, and sometime in November 1996, Pace—with Howard's consent—went to Pace's supervisor, Ginger Toucher, to explain Howard's problem and provide Toucher with a copy of Howard's earlier letter to McCall. At that point, Toucher called both of Howard's supervisors, Michael Erk and John Baranowski, into her office to explain what she had learned. This was the first that Erk or Baranowski had heard of Howard's allegations. Erk and Baranoswki then immediately informed NAVAIR's Office of General Counsel of the allegations, and Baranoswki located McCall and brought him into his office. McCall was immediately reassigned to another NAVAIR division on a different floor level. An investigation ensued, but NAVAIR could not verify Howard's charges. Nonetheless, McCall's reassignment off of Howard's floor was made permanent. Howard .did not complain of any harassment after this November date.

At all times during the period of alleged harassment, the Department of the Navy had a specific sexual harassment policy in place. The relevant portions of the policy provided:

> Individuals who believe they have been sexually harassed are encouraged to address their concerns or objections regarding the incident directly with the person demonstrating the harassing behavior. Persons who are subjected to or observe objectionable behavior should promptly notify the chain of command if:
>
> (1) The objectionable behavior does not stop; or
>
> (2) The situation is not resolved; or
>
> (3) Addressing the objectionable behavior directly with the person concerned is

not reasonable under the circumstances; or

(4) The behavior is clearly criminal in nature.

If the person demonstrating the objectionable behavior is a direct superior in the chain of command or the chain of command condones the conduct or ignores a report, individuals who have been subjected to or who observe objectionable behavior are encouraged to promptly communicate the incident through other available means.

(J.A. at 213.)

In January 1997, Howard filed an EEO complaint with NAVAIR, alleging that the Navy discriminated against her on the basis of her sex in violation of Title VII. On July 15, 1999, an EEOC administrative judge (AJ) entered a "Decision Without Hearing" against Howard. (J.A. at 180.) The AJ found that McCall had no supervisory authority over Howard, that Howard first informed NAVAIR of her allegations in November 1996, and that the Navy responded with immediate and appropriate action once it was put on notice in November. NAVAIR adopted the AJ's findings of fact and conclusions of law as its final agency decision. Howard appealed the final agency decision to the EEOC's Office of Federal Operations, and they affirmed the decision.

On March 18, 2002, Howard filed her civil complaint in the United States District Court for the District of Columbia. Howard's complaint put forward three separate claims pursuant to Title VII of the Civil Rights Act of 1964:(1) intentional sex discrimination; (2) intentional creation of a hostile work environment based on sex; and (3) retaliation for bringing a complaint of sexual harassment. During litigation, Howard's first two causes of action were determined to constitute a single claim for what traditionally has been known as "hostile work environment" sexual harassment.

On August 26, 2003, the district court transferred venue over Howard's complaint to the United States District Court for the Eastern District of Virginia. On November 30, 2004, the Navy moved for summary judgment. In her opposition to the Navy's summary judgment motion, Howard conceded that the retaliation claim should be dismissed, leaving only the hostile work environment claim. After briefing, the district court held a hearing on the Navy's motion.

At the conclusion of the hearing, the court orally granted the Navy's motion for summary judgment, implicitly finding that McCall was a co-worker, not a supervisor, and explicitly noting that once the Navy was put on notice in November 1996, its response was "about the fastest [the court had] seen an employer do in a long time in these cases." (J.A. at 569.) The court further found that action was not taken earlier by the Navy because Howard failed to "give the employer adequate information to trigger the kinds of response [she was] requesting." (J.A. at 569.)

By written order on January 10, 2005, judgment was entered in favor of the Navy. Howard timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291 (West 1993).

## II.

Howard argues that the district court erred in granting summary judgment to the Navy on her hostile work environment claim. She contends that the Navy is liable for McCall's harassment because he was her supervisor for purposes of Title VII. Howard further contends that even if McCall was not her supervisor, the Navy is nonetheless liable for the harassment because it knew or should have known of

the harassment and failed to take measures to stop it.

We review de novo the district court's grant of summary judgment in favor of the Navy, applying the same standard as did the district court. *See Laber v. Harvey,* 438 F.3d 404, 415 (4th Cir.2006) (en banc). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We must construe the facts in the light most favorable to Howard, and we may not make credibility determinations or weigh the evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos,* 264 F.3d 424, 435 (4th Cir.2001).

 Title VII is violated "[w]hen the workplace is permeated with [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). To establish a sexual harassment claim, Howard must prove that the offending conduct "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ocheltree v. Scollon Prod., Inc.,* 335 F.3d 325, 331 (4th Cir.2003) (en banc). For the purposes of their summary judgment motion, the Government conceded that Howard could prove the first three factors.

The only question on appeal, then, is whether there is any dispute of material fact as to whether McCall's alleged behavior can be imputable to the Navy. We conclude there is.

## A.

 At the summary judgment hearing below, the district court analyzed Howard's claim under the theory that McCall was her coworker, as opposed to her supervisor. Howard argues there are disputes of material fact as to whether McCall was Howard's supervisor for purposes of Title VII.

 The question of whether McCall was Howard's supervisor or her coworker is of great significance because in a case of harassment by a supervisor "with immediate (or successively higher) authority over the employee," an employer is vicariously liable for the harassment, subject to limited affirmative defenses not relevant here. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In a case where an employee is sexually harassed by a coworker, on the other hand, the employer may be liable only "if it knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree,* 335 F.3d at 334.

 In determining McCall's supervisory status with respect to Howard, the fundamental question we ask is "whether [McCall's] conduct was 'aided by the agency relation.'" *Mikels v. City of Durham,* 183 F.3d 323, 332 (4th Cir.1999) (quoting *Ellerth,* 524 U.S. at 763, 118 S.Ct. 2257). "Any harassing conduct that culminates in a tangible employment action against the victim is necessarily conduct aided by the agency relation, since it can only be taken by supervisory employees empowered by their employers to take such action." *Id.*

(internal quotation marks omitted). But "harassment by a fellow-employee having no authority of any kind over the victim never can be found aided by the agency relation; as to such employees, the agency relation provides no aid for their conduct but workplace proximity, and that does not suffice the purpose." *Id.* (internal quotation marks omitted). "Between these extremes, there remains otherwise actionable harassment that, though it does not culminate in tangible employment action, is nonetheless aided by the agency relation." *Id.* (internal quotation marks omitted).

Howard does not make a persuasive argument that McCall was her supervisor. The most powerful indication of supervisory status is the ability "to take tangible employment actions against the victim, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 333 (quoting *Ellerth,* 524 U.S. at 761, 118 S.Ct. 2257). No tangible employment action was taken against Howard. Moreover, Howard concedes that McCall did not possess any power to take tangible employment actions or make economic decisions affecting her. The record is devoid of any evidence suggesting that McCall could fire Howard, promote or demote her, reassign her, or take any other direct action against her. Instead, he was merely one of fifty-five staff members to whom Howard provided administrative support.

Nonetheless, the fact that Howard provided administrative support to McCall suggests that he did wield at least some authority over her. The record is clear, however, that like the situation in *Mikels,* the "authority possessed by [McCall] over [Howard] was at best minimal." *Id.* at 334.

In *Mikels,* we affirmed a summary judgment order in favor of the City of Durham on Mikels's sexual harassment claim. *Id.* at 335. Mikels was a private in the City police department who alleged that Acker, a corporal in the department, sexually harassed her. *Id.* at 326. The fact that Acker was her superior in rank, however, was not enough to show that he was her supervisor for purposes of Title VII. *Id.* at 331. This was because Acker did not have the power to take tangible employment actions against Mikels and his authority consisted only of "the occasional authority to direct her operational conduct while on duty." *Id.; see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 355 (7th Cir.2002) (holding that the alleged harassor's "marginal discretion" over the harasee's work operations was "not sufficient to impute Title VII vicarious liability to an employer"); *Rhodes v. Illinois Dep't of Transp.,* 359 F.3d 498, 506 (7th Cir.2004) (holding that evidence that alleged harassor "managed [plaintiff's] work assignments, investigated complaints and disputes, and made recommendations concerning sanctions for rule violations" was insufficient to show supervisory status). Moreover, the record showed that Mikels understood that her squad-level sergeant was her direct supervisor and that she had direct access to her sergeant without going through Acker. *Id.*

The record here is similarly clear. If anything, McCall's authority over Howard was only an occasional authority—shared with the other fifty-four staff members—to direct her operational duties. Moreover, Howard points to no evidence in the record that could lead to a conclusion that McCall's authority to request administrative assistance from Howard enabled his harassment. In short, McCall's alleged harassment of Howard was not aided by the agency relation. We therefore conclude that McCall was not Howard's supervisor for the purposes of Title VII.[4]

### B.

Because McCall was Howard's coworker, the Navy is only liable for his conduct if it was negligent "in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it." *Mikels*, 183 F.3d at 332; *accord Ocheltree*, 335 F.3d at 333–34 ("In a case where an employee is sexually harassed by a coworker, the employer may be liable ... if it knew or should have known about the harassment and failed to take effective action to stop it."). Accordingly, Howard argues that there are disputes of material fact as to whether the Navy was negligent in responding to McCall's alleged harassment.

"When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as well." *Spicer v. Virginia Dep't of Corrs.*, 66 F.3d 705, 711 (4th Cir.1995) (en banc). The Navy, however, "cannot avoid Title VII liability for coworker harassment by adopting a 'see no evil, hear no evil' strategy. Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Ocheltree*, 335 F.3d at 334. Moreover, the Navy "may be charged with constructive knowledge of coworker harassment when it fails to provide reasonable procedures for victims to register complaints." *Id.* But "[t]he law against harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 268 (4th Cir.2001)(internal quotation marks omitted). Just as an employer may not adopt a "see no evil, hear no evil" sexual harassment policy, an employee may not impute liability on an employer under a theory that the employer must exercise an all-seeing omnipresence over the workplace.

In order to determine whether the Navy was entitled to summary judgment, we must determine when the Navy had actual or constructive notice of McCall's alleged harassing behavior and whether the Navy's response was reasonable once such notice was provided. We conclude that (1) the Navy lacked constructive notice of McCall's alleged harassment before March 19, 1996, (2) there are questions of fact as to whether the Navy was placed on notice on March 19, 1996, and if so, whether the Navy's response was reasonable, and (3) the Navy had actual notice on November 20, 1996, and its response at that point was reasonable as a matter of law.

### 1.

Howard argues that the Navy had constructive notice of McCall's harassing behavior before March 19, 1996. She contends that the Navy's 1993 sexual harassment policy was per se inadequate and that McCall's previous behavior put the Navy on constructive notice that he was a harassor. We disagree with both of these arguments.

---

4. Howard also contends that vicarious liability is proper because she mistakenly believed that McCall exercised supervisory authority over her. This argument is of no avail to Howard. The Supreme Court has recognized that vicarious liability might be proper in the unusual case where there is a *reasonable* "false impression that the actor was a supervisor, when he in fact was not." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Such a false impression in this case, however, could not be reasonable on the record before us.

In *Ocheltree*, we concluded that liability could be imputed to the employer because its sexual harassment policy "fail[ed] to provide reasonable procedures for victims to register complaints." *Id.* at 334. In the context of that case, however, we further noted that it was "debatable whether the company actually [had] a sexual harassment policy," and that even if it did, it was so sparse that "a jury could reasonably find that it fail[ed] to provide reasonable avenues of complaint." *Id.*

In *Ocheltree*, the company provided no documents to employees mentioning sexual harassment, conducted no training, and merely had a policy stating that "verbal abuse" was "not acceptable" and "grounds for termination." *Id.* Such circumstances, however, are a far cry from the Navy's 1993 policy. The Navy had a an eleven-page "Department of the Navy Policy on Sexual Harassment" and issued memoranda "for all hands" explaining that "[s]exual harassment is prohibited and will not be tolerated." (J.A. at 210, 208.) Unlike the insufficient policy examined in *Ocheltree*, the Navy's policy and memoranda clearly defined sexual harassment and made it abundantly clear that such behavior would not be tolerated.[5] Accordingly, a reasonable juror could not find that the Navy adopted a "see no evil, hear no evil" sexual harassment strategy, *Ocheltree*, 335 F.3d at 334, and this case does not amount to one of the rare instances where constructive notice could be found due to a company's nearly non-existent sexual harassment policy.[6]

■ Howard also contends that the Navy was on notice because McCall was a repeat offender with "a history of inappropriate behavior in the office." (Appellant's Br. at 4.) Specifically, she points to the affidavit of Cresswell Elmore, a previous supervisor of McCall who worked at NAVAIR prior to Howard joining the branch. In his affidavit, Elmore stated:

> Before [the] policy came out regarding zero tolerance for sexual harassment, there was a time when "girlie" pictures were allowed to be hung in cubicles, and there was a time when I found those type of pictures in Mr. McCall's work area. Once the policy became zero tolerance, I had an occasion to ask Mr. McCall to remove that type of material from his work area. It reoccurred on one occasion, and I went through the same steps again to ask him to remove the material from his area. I also had given him verbal warnings about language that could not be used in the work environment.

(J.A. at 455.)

Howard's contention that the Navy's knowledge of McCall's pictures or inappropriate language somehow placed the Navy on notice of McCall's alleged harassment of Howard is unavailing. She cites neither case law nor evidence in the record that suggests that an employee's display of inappropriate images or use of foul language

---

5. The Navy's policy was also unlike the one at issue in *Ocheltree* in that it offered numerous avenues for complaint in order to ensure that when an employee was being harassed by a supervisor, that employee was afforded alternative means of notifying the chain of command.

6. Howard also argues that even if the Navy had an adequate policy, there are disputes of material fact as to whether the Navy disseminated its sexual harassment policy to her. Yet

there is no evidence in the record that could lead to a conclusion that the Navy failed to disseminate its policy. To the contrary, the record contains a memorandum addressing the "Sexual Harassment Policy" disseminated to "all hands." (J.A. at 208.) Moreover, NAVAIR conducted mandatory sexual harassment training for all employees. Finally, Howard admits to have "taken a class," which covered the matter. (J.A. at 365.)

suffices to put an employer on notice that the employee is by nature a sexual harassor inclined to assault another employee in the manner Howard alleges.[7] Although we will infer knowledge on the part of the employer when that employer altogether fails to promulgate an adequate sexual harassment policy, a factfinder may not—without more—find that an employer had notice of the type of specific harassment alleged here based solely on the alleged harassor's isolated past uses of inappropriate language and displays of lewd images. Accordingly, we affirm the district court's award of summary judgment for any alleged harassment occurring before March 19, 1996, when Howard claims she first notified someone in a supervisory position of McCall's behavior.

### 2.

◼ Howard argues that the Navy was placed on notice of the alleged harassment in March of 1996 when she spoke with Pendleton in the human resources office, and that Pendleton's response was not reasonable. We agree that summary judgment on this point was improper and conclude that a reasonable trier of fact could find that Howard's conversation with Pendleton was sufficient to place the Navy on notice of McCall's behavior, and that given Howard's statements to Pendleton, there exists a factual issue as to the reasonableness of his response.

After the alleged March 6 assault, Howard admits that she did not inform any of her direct supervisors. Instead, she drafted a letter to McCall. Howard, however,

argues that by also informing Pendleton of her problem, she went far enough to put the Navy on legal notice of the harassment. The Navy disagrees, first arguing that Howard could not have provided the Navy "with legally-sufficient notice by informing just any NAVAIR employee." (Appellee's Br. at 49.) While this statement rings true in the abstract, Pendleton was not "just any NAVAIR employee." He was a senior member of NAVAIR's Human Resources Division with experience in harassment complaints. Moreover, he specifically told Howard to come to him with any further problems, telling her, "[t]his is my job. This is what I do." (J.A. at 323.) Accordingly, if Howard in fact notified Pendleton of the harassment, that notification could be found sufficient to place the Navy on notice.

When Howard entered Pendleton's office in March, 1996, she told Pendleton that "this mother-f——r put his hands on me." (J.A. at 322.) When Pendleton asked, "[w]ho," she responded by stating that it was "[s]omebody old enough to be my grandfather," before finally indicating that it was McCall. (J.A. at 322.) According to Howard's deposition, Pendleton responded by simply telling Howard to write McCall a letter and keep track of any future harassing behavior, making sure to report any further instances to him[8] or to one of Howard's supervisors. He did not get to the bottom of her allegations. There is nothing in the record suggesting that he asked to see the letter or attempted to learn the specifics of Howard's allegations. There is nothing to suggest that he spoke with McCall or others about

---

7. Howard's brief further states that the record "could support a finding by the jury that the Navy was on notice because of previous complaints about McCall." (Appellant's Br. at 21.) Howard, however, points us to no place in the record detailing any previous harassment complaints about McCall and our independent review of the record discovered no such instances.

8. We note that in addition to instructing Howard to report any future harassment, Pendleton periodically checked in with Howard to see how she was doing.

Howard's problem, nor is there anything to suggest an inquiry, much less an investigation of any kind. In short, Howard alleges that Pendleton's only response to her statement that McCall put his hands on her and that she did not like the touching was for her to write McCall a letter and notify someone if McCall "harasses [her] again." (J.A. at 323.)

While a reasonable juror could find that Pendleton's response to Howard was sufficient given the lack of details in her allegation, we believe a reasonable juror could also conclude otherwise. *See, e.g., Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 442 (2d Cir.1999) ("A factfinder may well conclude that [the employer's] responses were reasonable and adequate. We cannot, however, say as a matter of law that the record evidence compels only that result. Accordingly, summary judgement should not have been granted on this ground.") (emphasis omitted). At the very least, a juror could conclude that it was unreasonable for Pendleton to not ask follow-up questions in an effort to determine the exact way in which McCall put his hands on Howard. We base this conclusion on the belief that the harsh language used by Howard in describing McCall and his alleged physical

assault was sufficient to at least put Pendleton—an experienced human resources officer—on notice of a potentially serious workplace-harassment problem between Howard and McCall. In other words, there is a question of fact as to whether— at that point—the Navy should have known that Howard was alleging harassment based on her sex.[9] We further conclude that based on that level of information, a reasonable juror could find that Pendleton was negligent in responding to Howard's allegations.[10] *See Malik v. Carrier Corp.*, 202 F.3d 97, 107 (2d Cir. 2000)("An employer's conduct of an investigation and determination of its scope must be viewed *ex ante* ....").

We recognize that an employee claiming harassment by a coworker bears significant responsibility in notifying the employer. *See, e.g., Barrett*, 240 F.3d at 268 (noting that "[l]ittle can be done to correct [harassing] behavior unless the victim first blows the whistle on it"). We further recognize that the unpleasant nature of reporting harassing conduct does "not alleviate the employee's duty ... to alert the employer to the allegedly hostile environment," *id.*, because such a rule "would completely undermine Title VII's basic policy 'of encouraging forethought by

9. We note that Howard alleges that Pendleton told her that she needed to write everything down "if [McCall] *harasses* [her] again." (J.A. at 323 (emphasis added).) Pendleton's response leads to the inference that he at least knew that she was alleging workplace harassment of some kind.

10. Howard goes further in contending that Pendleton's advice to write a letter was unreasonable as a matter of law considering McCall had just sexually assaulted her. We reject this argument because such a contention neglects the fact that she never informed Pendleton that Howard sexually assaulted her. This fact is critical because in a Title VII claim, the issues of employer notice and response are closely connected insomuch as the

reasonableness of an employer's response must be examined in relation to the specificity of notice received. In other words, the employer's response must always be viewed in light of what it actually knew or should have known at the time of its response.

Thus, while a juror could find that Howard's comments were sufficient to place the Navy on notice of a hostile work environment claim, there is a difference in degree in knowing that McCall "put his hands" on Howard and knowing that McCall inserted his fingers in Howard's vagina. Although an employer's response to the more general allegation might be deemed reasonable, that same response might be deemed unreasonable had the employer known the more specific details.

employers and saving action by objecting employees.'" *Id.* (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Ellerth,* 524 U.S. at 764, 118 S.Ct. 2257). Nonetheless, Title VII also places significant responsibilities on employers in reasonably responding to employee allegations. And in the circumstances of this case, we hold that a reasonable juror could find that Howard's comments to Pendleton were sufficient to put the Navy on notice of at least a potential hostile work environment and that the Navy's response to that notice was negligent. Accordingly, we vacate the district court's award of summary judgment with respect to any alleged harassment that occurred between the period of March 19, 1996 and November 20, 1996.

### 3.

 Howard's final argument is based on her contention that once the Navy received notice of her specific allegations on November, 20, 1996, its response was unreasonable. We disagree.

Once a copy of Howard's letter made it into the hands of a Navy supervisor on November 20, 1996, McCall was immediately transferred to another floor and out of Howard's working group. Moreover, this transfer was made permanent. In fact, the district court noted that the Navy's response was "about the fastest [the court had] seen an employer do in a long time in these cases." (J.A. at 569.)

Howard's argument that the Navy was unreasonable because it did not further punish McCall after conducting an inconclusive investigation is without merit. What is most important is that there were no further instances of harassment after this date—a fact that Howard concedes—and "when an employer's remedial response results in the cessation of the complained of conduct, liability must cease as

well." *Spicer,* 66 F.3d at 711; *see also Mikels,* 183 F.3d at 329–30 (describing this principle as "most important [ ]"). Accordingly, we conclude that the Navy is entitled to summary judgment for the period after November 20, 1996, because its response at that point was reasonable.

### III.

In sum, we recognize that McCall's alleged behavior was beyond unacceptable and plainly criminal in nature. Nonetheless, Title VII requires a claimant to show more than just severe harassment in order to hold an employer liable for an employee's behavior. And because we conclude that McCall was Howard's coworker for the purposes of Title VII and Howard cannot show that the Navy should have known about McCall's behavior prior to March 19, 1996, we affirm the district court's award of summary judgment with respect to that period. We also affirm the award of summary judgment with respect to the period after November 20, 1996, because the Navy's response resulted in the cessation of any harassing behavior. For the period of time between March 19 and November 20, 1996, however, we vacate the district court's award of summary judgment and remand the case for proceedings not inconsistent with this opinion.

*AFFIRMED IN PART; VACATED AND REMANDED IN PART*