Unpublished opinions are not binding precedent in this circuit.
WILKINSON, Circuit Judge:
Abigail Wilson raises numerous federal and state claims against her employer, Gaston County, in connection with the sexual harassment and hostile work environment she alleges she endured at the hands of her co-worker, Jim Putman.[1] The district court granted summary judgment in favor of Gaston County on each cause of action. The various claims hinge chiefly on whether Gaston County had adequate notice of *195 the sexual harassment. Under the facts of this case we conclude that it did not.
I.
Wilson recounts the following series of events. She was hired as a paramedic with Gaston County Emergency Medical Services (“GEMS”) in April 2009. In September 2010, she notified her supervisor, Captain Thomas Cleary, that she was showing signs of breast cancer and would need time off for medical treatment. Capt. Cleary recommended that Wilson apply for leave under the Family Medical Leave Act (“FMLA”), 29 U.S.C. § 2601 et seq. Around the same time, Wilson received her third speeding ticket within the preceding three years while driving her private vehicle during non-work hours. The terms of Gaston County’s insurance policy prohibited Wilson from driving emergency vehicles until she no longer had three speeding tickets within the three-year timeframe. Her prohibition would last at least eighteen months. Wilson was fired, subject to rehiring “[ajfter driving record clears.” J.A. 30.
Wilson appealed her termination, claiming that other employees had incurred similar driving suspensions yet were not fired. She also appealed to the Department of Labor, which concluded she was terminated in violation of the FMLA. Wilson was reinstated a week later with full backpay and agrees that she was made whole. Upon returning to work, however, Wilson claims she was held to a higher standard than other employees, targeted for corrective or disciplinary action, and subjected to the hostile work environment described below.
In December 2010, GEMS hired Putman as another paramedic. Wilson contends that Putman began harassing her eleven months later, telling her she had a “nice ass,” sending her pictures of his genitals, asking for naked pictures in return, expressing his desire to kiss and have illicit forms of sex with her, and making other unwanted physical contact. This behavior persisted despite Wilson’s repeated protests.
The most serious of these events occurred in December 2011. Wilson was sitting in the passenger seat of an emergency vehicle parked at a county station when Putman reached through the open vehicle door and began to tickle and grope her. When she resisted, Putman pulled her from her seat and pinned her against the side of the vehicle, proceeding to grope her breasts, pelvic area, and genitals until a coworker approached. Then, in January 2012, Putman walked up behind her and slapped her buttocks so hard that her sunglasses and clipboard went flying. Wilson explains that both encounters left bruising either behind her right knee or on her buttocks, respectively.
In March 2012, another co-worker confronted Putman about his inappropriate behavior toward Wilson. This altercation escalated quickly and attracted the attention of Captain James McConnell, who directed Wilson to file a formal complaint of sexual harassment with Human Resources. The ensuing investigation concluded that Putman had sexually harassed Wilson, and recommended that he be issued a written warning, transferred to a different shift, sent to counseling, and advised that additional violations would result in increased disciplinary action or termination. Gaston County adopted these recommendations and further suspended Putman for two shifts without pay.
In the following months, Wilson occasionally encountered Putman when their shifts would exchange keys to the emergency vehicles. Wilson claims that Putman took these opportunities to throw the keys at her, call her a “bitch,” and slam his *196 body into her as they passed to knock her off balance. When Chief Mark Lamphiear learned of their proximity, he notified Human Resources and he once again changed Putman’s shift assignment to avoid future encounters.
On January 9, 2013, Wilson filed suit against Gaston County based on the foregoing events. Wilson claimed, as relevant here, that Gaston County subjected her to a hostile work environment resulting from pervasive and severe sexual harassment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. She also claimed that Gaston County unlawfully retaliated against her in violation of both the FMLA and Americans with Disabilities Act (“ADA”), 42 U.S.C. § 12101 et seq., by holding her to a higher standard than other employees and ignoring her repeated complaints about Putman after she was reinstated following her temporary discharge. In addition, Wilson argued that Gaston County was liable for Putman’s conduct under numerous state law tort theories, including negligent retention and supervision, battery, and intentional infliction of emotional distress. Gaston County strongly disputed Wilson’s version of events, especially that she repeatedly notified Gaston County of the ongoing sexual harassment.
The district court granted summary judgment to Gaston County on each cause of action. Wilson appeals.
II.
The “primary objective” of sexual harassment liability is “a prophylactic one.” See Kolstad v. Am. Dental Ass’n, 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 405, 417, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). The emphasis is “not to provide redress but to avoid harm.” See id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 806, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Notice is therefore a predicate of employer liability because it provides an opportunity for the employer to correct and prevent sexual harassment, and to do so sooner rather than later. Title VII, for example, was “designed to encourage the creation of antiharassment policies and effective grievance mechanisms.” Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 764, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).
As a result, we have repeatedly held that “an employee claiming harassment by a coworker bears significant responsibility in notifying the employer.” Howard v. Winter, 446 F.3d 559, 570 (4th Cir. 2006). Indeed, “ ‘an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists’ under its reasonable procedures.” EEOC v. Xerxes Corp., 639 F.3d 658, 674 (4th Cir. 2011) (quoting Howard, 446 F.3d at 567) (emphasis in original). Particularly in large entities with a great number of workers, employers are not necessarily aware of every interaction between employees and “cannot be saddled with the insurmountable task of conforming all employee conduct at all times to the dictates of Title VII, irrespective of their knowledge of such conduct.” Id. at 675 (quoting Spicer v. Va., Dep’t of Corr., 66 F.3d 705, 711 (4th Cir. 1995) (en banc)). Even “the unpleasant nature of reporting harassing conduct does not alleviate the employee’s duty ... to alert the employer to the allegedly hostile environment.” Howard, 446 F.3d at 570 (internal quotation marks omitted).
This does not mean employers can assume a mentality of “see no evil, hear no evil.” Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 334 (4th Cir. 2003) (en baric). In fact, “an employer may be charged with constructive knowledge of coworker *197 harassment when it fails to provide reasonable procedures for victims to register complaints.” Id. By establishing an environment hospitable to reporting, employees are encouraged to come forward, sexual harassment can be prevented sooner rather than later, and employers will not be burdened with liability for conduct of which they were unaware.
III.
Wilson claims that Gaston County subjected her to a hostile work environment and retaliated against her in violation of the FMLA and ADA. She also claims that Gaston County is liable for Putman’s sexual harassment under the numerous state law tort theories noted above. Although each claim is distinct, the underlying issue is whether Gaston County.had sufficient notice of the alleged sexual harassment to sustain liability. We review the district court’s grant of summary judgment de novo, drawing all reasonable inferences in favor of Wilson as the non-moving party. See Freeman v. Dal-Tile Corp., 750 F.3d 413, 419-20 (4th Cir. 2014).
A.
To prevail on a claim of hostile work environment, Wilson must show that she endured harassment that was (1) unwelcome, (2) based on her sex, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere, and (4) imputable to her employer. Freeman, 750 F.3d at 420; Ocheltree, 335 F.3d at 334-35; see Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Because Putman was not Wilson’s supervisor, Ga-ston County is only liable if it “knew or should have known about the harassment and failed to take prompt remedial action reasonably calculated to end the harassment.” Freeman, 750 F.3d at 423 (internal quotation marks omitted). In other words, Gaston County is liable if it was negligent .in responding to co-worker sexual harassment after receiving actual or constructive notice of the same. Howard, 446 F.3d at 567; Mikels v. City of Durham, 183 F.3d 323, 329 n.4, 332 (4th Cir. 1999); see Vance v. Ball State Univ., — U.S. --, 133 S.Ct. 2434, 2441, 186 L.Ed.2d 565 (2013).
Wilson fails to allege sufficient facts for a reasonable jury to conclude that Gaston County had adequate notice of Put-man’s sexual harassment, or that Gaston County responded unreasonably once it was aware of the hostile work environment. Wilson advances numerous theories by which Gaston County was on notice, which we shall address in turn.
1.
First, Wilson claims that she disclosed Putman’s behavior to her supervisors, Lieutenant Travis Adams[2] and Capt. McConnell, beginning in November 2011. She allegedly informed them of the illicit text messages, unwanted touching, and bruises Putman left on her thigh and buttocks. She explains that Lt. Adams and Capt. McConnell indicated they would handle the situation and that she should not report anything to Chief Lamphiear or Human Resources. Wilson also reports that she repeatedly pleaded to be transferred away from Putman, but nothing happened. The unwanted touching and illicit pictures continued.
Unfortunately for Wilson, her allegations are in conflict with her own prior statements. In March 2012, Wilson prepared a signed, handwritten complaint in *198 connection with the formal Human Resources investigation into Putman’s behavior. Her account conveys over and over both that she intentionally refrained from disclosing the details of her situation and her reasons for doing so. She explained,
I did not feel comfortable complaining because of my history at GEMS, [because] I knew Jim was the only source of income for his wife and small child and [because] I just did not want to rock the boat.
Supp. JA 4. And again,
I learned that Jim’s wife was pregnant with twins which only furthered my resolve to try to put up with it for his family’s sake even at the detriment of my own family.
Supp. J.A. 4. And again,
I see now that I should have reported everything but I thought I was doing what was best for my career, GEMS, our shift and Jim’s family.... I feel bad that it had to happen the way it did in order for everything to be brought into the open. But due to my own fear, my non-confrontational personality and my worry for Jim’s wife and kids I don’t know that I would have ... come forward .... I now regret keeping quiet and wished that I would have come forward on that first day. But hindsight is 20/20 and I can’t undo it.
Supp. J.A. 7-8.
Wilson later signed a typed summary of her statement, explaining that when the harassment started she “more or less laughed it off due to the nature of what was happening.” Supp. J.A. 9. After the harassment escalated, she once more recounted,
I realize that at this time I should have come forward and complained but I did not.... I did not want to file a complaint due to the fact of I did not want a confrontation but also because I have met Jim’s wife and I know that she is a very nice woman and I also knew that they had a small child and I did not want his wife to be hurt or for Jim to possibly lose his job, thereby losing all income for his family.... My plan was to just try and ignore it and hope that it went away.... I acknowledge that I probably should have made a bigger effort to report this’ problem to Human Resources but I was truly trying not to rock the boat and I was attempting to avoid causing any pain to Jim’s wife and child, I was uncomfortable making this type of complaint and causing a problem of this magnitude. I also knew that making a complaint of this nature would have caused multiple conflicts on this shift and killed morale. I realize now that burying my head in the sand and hoping the problem would go away was not the proper way to approach this problem. I thought that by telling Jim to stop repeatedly and telling him that it bothered me and my husband was sufficient in handling of it but I know now that it was not.... At the time I thought I was doing what was best for Jim’s family and my own.
Supp. J.A. 9-11.
When co-workers would comment on Putman’s behavior, Wilson said that she “would just shrug and walk away.” Supp. J.A. 3. She wrote, “I had told them all that my intention was to just try and ignore it and pray that it stopped.” Supp. J.A. 3. Wilson’s husband was likewise angry, but Wilson “explained [her] position on not wanting to complain” and he “agreed to stay home.” J.A. 2,10. The first mention in Wilson’s account of reporting Putman’s conduct to any of her supervisors is a conversation with Captain Billy Mitchell on February 28, 2012. But even then, Wilson only did so because a co-worker insisted and she admits that she “did not go into *199 much detail.” Supp. J.A. 4. Wilson simply-requested not to be partnered in an emergency vehicle with Putman, and her request was granted.
We cannot ask a jury to resolve Wilson’s claims by. deciding between her own inconsistent statements. We have consistently held that “[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff’s testimony is correct.” Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984); see, e.g., Stevenson v. City of Seat Pleasant, 743 F.3d 411, 422 (4th Cir. 2014). A genuine issue of material fact is something on which the parties disagree, not on which one party is internally contradictory.
Wilson insists that her handwritten and typed statements catalogue reluctance to file a formal complaint with Human Resources, not a general failure to report Putman’s conduct to her supervisors. In support, Wilson submitted a signed declaration to the district court making this distinction. Wilson additionally points to a phrase in her prior typed statement quoted above explaining that she “probably should have made a bigger effort to report this problem to Human Resources.” Supp. J.A. 11 (emphasis added).
Review of both Wilson’s handwritten and typed statements tell a different story. Notably missing is any indication that she disclosed the situation to her supervisors prior to her conversation with Capt. Mitchell and her complaint to Human Resources one week later. Furthermore, not once does Wilson mention text messages with illicit pictures or that Putman groped her breasts, pelvis, and genitals after pulling her from the emergency vehicle. Human Resources subsequently based its finding of sexual harassment on allegations or admissions of poking, tickling, periodic text messages, “inappropriately touching Mrs. Parton [Wilson] on her knee,” and bruising her leg. J.A. 86-86. Both Wilson’s handwritten and typed statements are replete with and even exemplify a common theme that she generally refused to report what was happening to avoid confrontation and to protect Putman’s family.
We are concerned, moreover, that this attempted distinction between reporting to supervisors and filing a formal complaint was submitted to the district court only after Gaston County- filed a motion for summary judgment, over three years after Wilson’s statements quoted extensively above, and over two years after she commenced legal proceedings. There is a limit to how much law can allow a party to switch or distinguish earlier statements that prove problematic later in litigation. At all times, Wilson’s allegations conflict with her own provided reasons for not reporting Putman’s behavior and for discouraging her co-workers and husband from doing the same.
2.
Second, Wilson claims that even if actual or constructive knowledge was initially insufficient, Gaston County was definitely on notice following the Human Resources investigation that concluded Putman was sexually harassing her. She explains that Gaston County nevertheless failed to take adequate remedial action, allowing Putman an opportunity to throw his keys at her, call her a “bitch,” and physically assault her. Wilson contends that leaving Putman in a position where he could continue to interact with Wilson was alone sufficient to establish a hostile work environment, yet when she reported her ongoing problem to Lt. Adams he simply told her to “put on her big girl pants and deal with it.” J.A. 16.
*200 Nevertheless, Wilson overlooks the fact that “[b]ecause there is no strict liability and an employer must only respond rearsonably, a response may be so calculated even though the perpetrator might persist.” Xerxes, 639 F.3d at 669-70 (quoting Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998)); see Mikels, 183 F.3d at 330 (“We have not required that particular remedial responses be the most certainly effective that could be devised ....”); Spicer, 66 F.3d at 710 (“[W]e have never suggested that an employer must make the most effective response possible and we have consistently held that an employer is only liable for sexual harassment committed by its employees if no adequate remedial action is taken.... ”). “[T]he mere fact that harassment reoccurs in the workplace, either by the same offender or different offenders, does not, ipso facto, allow a jury to conclude that an employer’s response was not reasonably calculated to end the harassment.” Xerxes, 639 F.3d at 669.
Even were we to take Wilson’s allegations to be true, that still does not suffice to establish Gaston County’s liability. We-have explained that “[t]here is no ‘exhaustive list’ or ‘particular combination’ of remedial measures or steps that an employer need employ to insulate itself from liability.” See id. (quoting EEOC v. Cent. Wholesalers, Inc., 573 F.3d 167, 178 (4th Cir. 2009)), Instead, “responses that have been held reasonable have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes and transfers, oral and written warnings to refrain from harassing conduct, reprimands, and warnings that future misconduct could result in progressive discipline, including suspension and termination.” Id. at 670 (quoting Adler, 144 F.3d at 676-77).
Once Wilson reported Putman’s conduct to Human Resources, Gaston County’s response was immediate and decisive. Put-man was suspended without pay, issued a written warning, transferred to a different shift, sent to counseling, and advised that further misconduct would result in increased discipline or termination. Although she disputes the ultimate efficacy of Ga-ston County’s determined response, Wilson actually conceded that transferring Putman’s shift was the appropriate remedy. See J.A. 612. And again, Wilson’s handwritten and typed statements 'do not convey the same egregious behavior she now asserts.
Finally, when Gaston County learned that Putman’s new shift occasionally overlapped with Wilson’s, it took immediate steps to resolve that issue as well. Chief Lamphiear ordered another shift transfer to avert any future encounters.
3.
Third, Wilson claims that Gaston County had adequate notice of Putman’s behavior because Lt. Adams and Capt. McConnell witnessed additional harassment on multiple occasions during workplace meetings. She specifically recounts that Lt. Adams and Capt. McConnell watched as Putman pulled her hair and poked her.
Even assuming Lt. Adams and Capt. McConnell witnessed this behavior, Wilson described the conduct as “childish mess-ings” and “things you see second graders doing to each other.” J.A. 596. As inappropriate or unbecoming as it may be, such workplace behavior falls short of sexual harassment. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (“We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth ‘a general civility *201 code for the American workplace.’ ” (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); id. (“[judicial standards for sexual harassment must ‘filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.’”) (quoting Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (internal quotation marks omitted))).
4.
Fourth, Wilson claims that Gaston County had constructive notice of Put-man’s sexual harassment because he had engaged in this type of behavior previously, Putman was fired from his previous job for throwing his keys at a female supervisor and calling her a “bitch.” After arriving at GEMS, he was disciplined for creating a hostile work environment for another employee. Wilson also recounts in detail how a fellow coworker, Jessica Coe Spurrier, had to “punch” Putman in the stomach to keep him from kissing her. J.A. 138.
These particular incidents were insufficient to put Gaston County on notice for the type of behavior Wilson now alleges. While the actual circumstances of Put-man’s previous dismissal remain murky or speculative, they are more revelatory of a volatile temperament than of a propensity to engage in sexual harassment. And Put-man’s previous written warning for creating a hostile work environment was not on the basis of sexual harassment, either. See J.A. 157. As to Spurrier, she referred to the encounter as “more annoying than anything” and did not find it necessary to file an actual complaint. J.A. 91-92. Spurrier only asked to not be partnered with Putman in the future and her request, too, was granted. She confirmed there were no further issues.
In sum, by Wilson’s own account, Gaston County was not clearly notified of what are now Wilson’s allegations. When it did receive notice, it responded proactively in an effort. to prevent an unwelcome recurrence. Further, Gaston County had a reasonable sexual harassment policy and provided annual training whereby employees were explicitly encouraged to report alleged violations. While we do not suggest that such a policy alone operates to foreclose employer liability, it does weigh measurably in the balance. “The institution and enforcement of [an anti-harassment] policy, in conjunction with an adequate complaint procedure, aid the employer in establishing that it has exercised reasonable care to prevent discrimination.” Xerxes, 639 F.3d at 669 (alteration in original) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 187 (4th Cir. 2001)). The record shows that when Gaston County was made aware of alleged sexual harassment by Putman, it took immediate steps to investigate and remedy the situation. This is not the case of a careless or calloused entity that discourages reporting or otherwise turns a blind eye to a hostile work environment.
B.
We now turn to Wilson’s other claims. To prevail on a claim of retaliation in violation of the FMLA or ADA, Wilson must show (1) that she engaged in protected conduct under either statute, (2) that Gaston County took adverse action against her, and (3) that the adverse action was casually connected to the protected conduct. Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 429 (4th Cir. 2015) (FMLA retaliation); Rhoads v. FDIC, 257 F.3d 373, 391-92 (4th Cir. 2001) (ADA retaliation); see 29 U.S.C. § 2615 (FMLA retaliation); 42 U.S.C. § 12203(b) (ADA retaliation). Wilson alleges that she was held *202 to a higher standard and disciplined more frequently than other employees after she requested medical leave for cancer treatment in September 2010, and that Gaston County also refused to address her complaints of sexual harassment as a result.
Wilson largely concedes, however, the misconduct for which she received written warnings, including taking unauthorized leave, text messaging while on active EMS response, professional misconduct, and failure to follow medical protocol. Moreover, her first written warning came almost a year after she notified Capt. Cleary of her medical situation. Gaston County also introduced undisputed evidence that supervisors were universally instructed to scrutinize employee performance, such that many of Wilson’s co-workers received substantially more written warnings than she did. The district court was correct to observe that “reprimands and poor performance evaluations occur with some frequency in the work-placet and] are much less likely to involve adverse employment actions than the transfers, discharges, or failures to promote whose impact on the terms and conditions of employment is immediate and apparent.” Adams, 789 F.3d at 431. Furthermore, because Wilson fails to show that Gaston County was adequately aware of Putman’s sexual harassment, or that it failed to respond reasonably once it was notified, Gaston County cannot be said to have allowed a hostile work environment to persist in retaliation for Wilson’s request for medical leave.
C.
Wilson finally claims that Gaston County is liable under North Carolina state law for negligent retention and supervision, battery, and intentional infliction of emotional distress. She contends that Gaston County was negligent in its response to Putman’s conduct, or later ratified his behavior by refusing to adequately address the' hostile work environment he created. Because intentional sexual harassment is beyond the scope of normal employment, each claim requires Wilson to show that Gaston County had actual or constructive notice of Put-man’s behavior and then failed to take reasonable remedial action. See Medlin v. Bass, 327 N.C. 587, 398 S.E.2d 460, 462 (1990) (negligent retention and supervision); Brown v. Burlington Indus., Inc., 93 N.C.App. 431, 378 S.E.2d 232, 235-36 (1989) (respondeat superior liability for torts); Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 340 S.E.2d 116, 121-22 (1986) (same). Especially when invoking respondeat superior for a battery or intentional infliction of emotional distress, Wilson must demonstrate “that the employer had knowledge of all material facts and circumstances relative to the wrongful act.” Hogan, 340 S.E.2d at 122.
As we have discussed at length, Wilson has failed to present an issue of triable fact that Gaston County had sufficient notice or failed to respond reasonably once it did become aware of Putman’s inappropriate behavior. Wilson’s own statements reveal her intention not to make known the nature of her hostile work environment allegations. While her reasons for non-disclosure may have been altogether laudable, they afford no basis for holding a company liable for sexually harassing conduct of which it was not even aware. Once again, when Gaston County did learn of Putman’s sexual harassment, it took immediate steps to discipline and transfer him. The County could not be negligent or held to “ratify” alleged conduct when it was unaware of the sexual harassment and then took prompt steps to remedy the situation.
IV.
For the foregoing reasons, the judgment is
AFFIRMED.

. Wilson also raised multiple claims against Putman that were remanded to state court after judgment was rendered in favor of Ga-ston County.

. The parties dispute whether Lt. Adams was a supervisor capable of receiving notice for Gaston County. Resolving that dispute is not necessary to our decision.