Filed: April 26, 2010

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-1265
(8:08-cv-00218-HMH)

CLARA WHITTEN,

        Plaintiff – Appellant,

    v.

FRED'S, INCORPORATED,

        Defendant - Appellee.

-------------------------------------------

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

        Amicus Supporting Appellant.

O R D E R

      Upon consideration of Appellee's unopposed Motion to Amend Opinion, the court grants the motion and amends its opinion filed April 1, 2010, as follows:

      On page 26, line 22; and page 30, line 1 –- the word "jury" is replaced with the word "fact-finder."

For the Court – By Direction

/s/ Patricia S. Connor
           Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

CLARA WHITTEN,

Plaintiff-Appellant,

v.

FRED'S, INCORPORATED,

Defendant-Appellee.

No. 09-1265

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

Amicus Supporting Appellant.

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
Henry M. Herlong, Jr., Senior District Judge.
(8:08-cv-00218-HMH)

Argued: January 27, 2010

Decided: April 1, 2010

Before TRAXLER, Chief Judge, AGEE, Circuit Judge,
and Catherine C. BLAKE, United States District Judge for
the District of Maryland, sitting by designation.

Vacated and remanded by published opinion. Chief Judge
Traxler wrote the opinion, in which Judge Agee and Judge
Blake joined.

**COUNSEL**

**ARGUED**: Mary Christine McCormac, Clemson, South Carolina, for Appellant. Susan L. P. Starr, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Supporting Appellant. Shahin Vafai, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellee. **ON BRIEF:** James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Supporting Appellant. Stephen T. Savitz, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellee.

**OPINION**

TRAXLER, Chief Judge:

Clara Whitten brought an action against her former employer, Fred's, Incorporated, asserting state law based claims of sexual harassment under the South Carolina Human Affairs Law. *See* S.C. Code Ann. §§ 1-13-10 - 110. The district court granted summary judgment in favor of Fred's, and Whitten appeals. We vacate the district court's decision and remand for further proceedings.

I.

The evidence presented by Whitten, viewed in the light most favorable to her, *see, e.g.*, *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167, 174 (4th Cir. 2009), establishes the following. Whitten began working for Fred's in April 2005. In February 2006, she was transferred from her position as assistant manager of the store in Greenville, South Carolina, to assistant manager of the Fred's store in Belton, South Carolina. Matt Green was the store manager in Belton.

Whitten worked for Fred's in the Belton store for only two days. Over the course of those two days, Green made it clear that he was unhappy that Whitten had been transferred to his store, repeatedly calling her dumb and stupid, and telling Whitten that he did not want her working in his store. On Whitten's first day of work (a Friday) in Belton, Green told her that if she wanted long weekends off from work, she needed to "be good to [him] and give [him] what [he] want[ed]." J.A. 123. Green told her that he would make her life a "living hell" if she ever took work matters "over [his] head." J.A. 227.

Later that afternoon, Whitten was in the store's small, semi-public office, which is on an elevated platform to give its occupants a view of the entire sales floor. Green walked behind her in the office and pressed his genitals against her back as he passed by. Whitten told Green not to do that again, but his response was simply to smile at her. Green later called Whitten into the storeroom in the back of the store. Fearing what might happen there, Whitten pretended not to have heard him. Green became angry with Whitten and ordered her to stay late to clean the store, telling her that the store should be spotless and that he did not care if it took her all night. (Whitten had been scheduled to leave before closing that night; Green informed her that he had let the manager who had been scheduled to close go home early.)

When Whitten arrived for work the next day, Green told her that she had set the store alarm improperly and that her punishment would be working on Sunday (Superbowl Sunday, in fact), which had been scheduled as a day off for Whitten. Later that day, Whitten was standing in the elevated store office. Green again passed behind her and again pressed his genitals against her as he moved by.

Sometime Sunday morning, before she was scheduled to open the store, Whitten called Paula Cox, the manager of the Greenville store. Whitten told Cox about Green's verbal and

physical conduct and told Cox that she was going to quit. Whitten also called Kelly Jackson, the Belton store operations manager. Whitten told Jackson about Green's conduct and again said that she was going to quit.

With her mother listening on an extension, Whitten called Robert Eunice, the district manager and Green's superior. Whitten told Eunice about Green's conduct, including the physical contact that happened in the store office. Eunice told Whitten that she was overreacting and that she should go on to work that day as if nothing had happened.[1] Eunice told her that they would talk to Green about things on Monday.

Given this advice, Whitten felt that she had no real option but to quit. Eunice apparently did not find Green's conduct objectionable or inappropriate, given his statement that Whitten was overreacting, and Eunice offered Whitten no way to avoid contact with Green.[2] Whitten therefore told Eunice that she was quitting her job. Eunice then called Green and sent him to Whitten's house to retrieve the store keys. When Green appeared at her house, Whitten handed him the keys and told him she would call the police if he did not leave.

---

[1]There is, of course, contrary evidence in the record. For example, Green denies ever touching Whitten inappropriately, and Eunice, while agreeing that he told Whitten she was over-reacting, contends that Whitten never told him about the physical contact and that she in fact denied it when he asked if Green had ever touched her. At a hearing on Whitten's claim for unemployment benefits, Cox stated that Whitten did not mention sexual harassment by Green, but Cox also testified that Whitten said "she was tired of . . . Green talking to her like a dog and *hitting on her*." J.A. 308E (emphasis added). As noted above, however, the procedural posture of this case requires us to recount the evidence in the light most favorable to Whitten.

[2]Although Green was not scheduled to work that day, Whitten feared that he would show up anyway, because it was common practice for Fred's store managers to check on their stores even on days off. As it turns out, Whitten was correct, and Green did appear at the store before it opened on Superbowl Sunday.

The next day, Whitten contacted Fred's corporate office to formally report Green's sexual harassment. This was Whitten's first opportunity to speak to someone in the corporate office—the office closed before Whitten left work on Friday, and it did not reopen until Monday morning. Fred's began an investigation into her complaints a few days later. Fred's ultimately closed the investigation without any findings, determining that Whitten's claims could not be verified or rejected. Green was not disciplined in any way and continued to be employed by Fred's, and Fred's did not offer any remedy to Whitten, such as reinstatement and transfer to another store.

Whitten commenced this action against Fred's in South Carolina state court, asserting only state law claims under South Carolina's Human Affairs Law. Fred's removed the action to federal district court on the basis of diversity of citizenship.

Fred's moved for summary judgment on Whitten's claims. Fred's argued that Whitten's claims were barred on various procedural grounds and that they failed on the merits. A magistrate judge recommended that Fred's motion for summary judgment be denied. The district court disagreed and granted summary judgment to Fred's. The district court addressed the substantive arguments only; it did not consider the various procedural bases that Fred's contended required dismissal of Whitten's claims. This appeal followed.

## II.

Before proceeding to the merits of Whitten's claims, we first consider the procedural issues not addressed by the district court but asserted by Fred's as alternate bases for affirming the district court's decision. *See, e.g.*, *Jackson v. Kimel*, 992 F.2d 1318, 1322 (4th Cir. 1993) ("In reviewing the grant of summary judgment, we can affirm on any legal ground supported by the record and are not limited to the grounds relied on by the district court.").

A.

Like similar federal anti-discrimination laws, the South Carolina Human Affairs Law requires a plaintiff to pursue administrative remedies before filing an action in court. *See* S.C. Code Ann. § 1-13-90(a). Whitten filed a complaint with the federal Equal Employment Opportunity Commission less than two months after the incidents in the Belton store, but she did not personally file a complaint with the South Carolina Human Affairs Commission. Fred's therefore argues that Whitten's claims are barred because she failed to exhaust state administrative remedies and that the district court's order should be affirmed on this basis.

The state statute under which Whitten is proceeding requires plaintiffs to "complain in writing under oath or affirmation to the Commission within one hundred eighty days after the alleged discriminatory practice occurred." S.C. Code Ann. § 1-13-90(a). The charge Whitten filed with the EEOC satisfied the technical requirements—it was in writing, under oath, and filed well within the 180-day limit. *See* J.A. 148. The South Carolina statute, however, requires that the complaint be made to "the Commission," a term defined as South Carolina's State Human Affairs Commission ("SHAC"), not the EEOC. *See* S.C. Code Ann. § 1-13-30(a). Although Whitten herself did not file a charge with SHAC, the EEOC did. That is, within a few days after receiving the charge and still well within the 180-day period, the EEOC forwarded Whitten's sworn charge to SHAC, as Whitten requested when completing the EEOC charge.[3] The question, then, is whether the EEOC's transmittal of Whitten's charge to SHAC satisfied the requirement that a charge of discrimination be made "to the Commission." S.C. Code Ann. § 1-13-90(a). We believe it did.

---

[3] The form language above Whitten's signature stated, "I want this charge filed with both the EEOC and the State or local agency." J.A. 148.

The evidence in the record shows that the EEOC did not simply notify SHAC that Whitten had filed a charge of discrimination, but instead mailed Whitten's executed charge to SHAC. Moreover, SHAC returned the "charge transmittal" cover form to the EEOC and explicitly acknowledged receipt of the charge. J.A. 295. In our view, this evidence is more than sufficient to establish that the charge was in fact filed with SHAC, as required by § 1-13-90(a).

Fred's presented no evidence suggesting that the complaint was not mailed to SHAC, and Fred's even acknowledged in its summary-judgment memorandum to the district court that the EEOC mailed the charge to SHAC. *See* J.A. 68. And because Fred's does not contend that Whitten's charge failed in any other manner to meet the requirements of South Carolina law, its claim that Whitten failed to exhaust the state administrative remedies thus clings to a fairly slender reed— that the charge was mailed to SHAC by the EEOC rather than Whitten herself.

The statute does not require that charges of discrimination be made in person at a SHAC office by the person complaining of discrimination, *see* S.C. Code Ann. § 1-13-90, and the relevant state regulations specifically permit discrimination charges to be mailed, *see* S.C. Code Ann. Regs. § 65-2(F) ("The complaint may be made in person to any member of the Commission's staff or mailed to the Commission's office in Columbia, South Carolina."). Given the language of the statute and regulations, we fail to see how the identity of the person dropping the properly executed charge in a mailbox has any legal significance.

Fred's offers no explanation of why it matters that the EEOC rather than Whitten mailed the charge to SHAC. Fred's does, however, seem to attach great importance to Whitten's statement in her deposition that she filed a charge only with the EEOC, not SHAC. Fred's contends that Whitten is bound by this statement and thus is precluded from arguing that she

filed a charge with SHAC. We disagree. Whitten's statement was nothing more than an acknowledgement of the undisputed fact that she personally submitted a charge only to the EEOC. There simply is no inconsistency between Whitten's factual statement and the argument pressed on appeal—that the EEOC mailed the charge to SHAC, thus satisfying the requirements of § 1-13-90(a).

Fred's likewise finds it significant that Whitten did not submit a copy of the worksharing agreement between SHAC and the EEOC to support what Fred's believes to be her position on appeal—that filing the charge with the EEOC was sufficient to exhaust the state administrative remedies. Whitten, however, does not argue that we should *deem* her to have exhausted state remedies because filing with the EEOC is tantamount to filing with SHAC. She argues, and we agree, that her charge of discrimination was *actually filed* with SHAC when the EEOC mailed her properly executed charge to SHAC. The terms of the worksharing agreement likely would have been relevant if Whitten were contending that filing with the EEOC alone was enough to meet the requirements of § 1-13-90(a). *Cf. Petrelle v. Weirton Steel Corp.*, 953 F.2d 148, 151 (4th Cir. 1991) (rejecting as unsupported by the terms of the worksharing agreement the plaintiff's argument that "a filing with the EEOC was tantamount to a filing" with the state agency). But Whitten does not make that argument, and, as recounted above, the evidence in the record is sufficient to show that Whitten's charge was filed with SHAC. *Cf. id.* at 153-54 (finding sufficient plaintiff's evidence that the EEOC actually referred the discrimination charge to the state agency, which satisfied the requirement under the federal law that an age-discrimination plaintiff initiate proceedings with the state agency before filing suit in federal court).

## B.

Fred's also argues that the district court's judgment should be affirmed because Whitten's claims are barred by the statute

of limitations contained in South Carolina's Human Affairs Law. Section 1-13-90 requires any court action to be commenced "within one year from the date of the violation alleged, or within one hundred twenty days from the date the complainant's charge is dismissed, whichever occurs earlier." S.C. Code Ann. § 1-13-90(d)(6). The EEOC dismissed Whitten's complaint and issued a right-to-sue letter on September 21, 2006. Whitten's suit was commenced on February 2, 2007, 134 days after the EEOC dismissal. Fred's contends that because Whitten did not file suit within 120 days after the EEOC's dismissal, her SHAC claim is time-barred, as would be any federal claim that Whitten might have asserted.

Whitten agrees that any federal claim would be time-barred, but she argues that her SHAC claim is timely, because the South Carolina statute refers to a dismissal by SHAC, not the EEOC. SHAC never issued a dismissal in this case, and Whitten therefore argues that she had one year to bring the action. Because the conduct giving rise to her complaints occurred on February 3-5, 2006, Whitten contends her action was timely filed.

The full text of § 1-13-90(d)(6) states that:

> If a charge filed with *the commission* by a complainant pursuant to this chapter is dismissed by the commission, or if within one hundred eighty days from the filing of the charge *the commission* has not filed an action under this chapter or entered into a conciliation agreement to which the complainant is a party, the complainant may bring an action in equity against the respondent in circuit court. The action must be brought within one year from the date of the violation alleged, or within one hundred twenty days from the date the complainant's charge is dismissed, whichever occurs earlier, except that this period may be extended by written consent of the respondent.

S.C. Code Ann. § 1-13-90(d)(6) (emphasis added). When the statute is read in full, it is apparent that the 120-day limitations period is triggered by a dismissal by "the commission," which, as previously noted, is a defined term referring to SHAC, not the EEOC.

After the EEOC transmitted Whitten's charge to SHAC, SHAC executed a form acknowledging the charge. SHAC checked the section of the form acknowledging receipt of the charge and indicating its intention "not to initially investigate the charge" rather than the section acknowledging receipt but indicating its "intention to dismiss/close/not docket the charge." J.A. 295. A state's preliminary decision to forgo investigation has significance for *federal* discrimination claims, in that such a decision permits the EEOC to begin its own investigation of the underlying charge without waiting sixty days, as would otherwise be required when a charge is filed first with the state agency. *See* 42 U.S.C.A. § 2000e-5(c) (West 2003); *EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110-11 (1988). As we have made clear, however, Whitten asserts only state law claims in this action, so the question before us is purely a matter of South Carolina law, not federal law. There is no language in the South Carolina act that would permit us to equate SHAC's preliminary decision to allow the EEOC to take the investigatory lead with a dismissal of a charge, *see* S.C. Code Ann. § 1-13-90(d)(4) (discussing dismissal of charge after investigation into the facts); S.C. Code Ann. Regs. § 65-2(J) (listing grounds upon which charge must be dismissed), nor is there any South Carolina case law equating the two.[4] Therefore, because SHAC never issued a dismissal, Whitten was entitled to the benefit of the one-year limitations period under S.C. Code Ann. § 1-13-90(d)(6).

---

[4]From what we can determine, no case from any South Carolina court has addressed the procedure for handling complaints asserted under the State Human Affairs Law.

Fred's contends that Whitten is trying to have her cake and eat it, too—that "Whitten is asserting, for purposes of exhaustion, that her filing with the EEOC was equivalent to filing with SHAC, but simultaneously contending that the EEOC's dismissal does not qualify as dismissal by SHAC. Whitten cannot have it both ways." Brief of Respondent at 26. This argument, however, is premised on a misapprehension of the basis for Whitten's exhaustion argument. As we explained above, we do not conclude that Whitten's EEOC filing is the equivalent of a SHAC filing; we conclude that her charge was in fact filed with SHAC. And as to the limitations question, we simply conclude that the statute plainly and unambiguously requires a dismissal *by SHAC* to trigger the 120-day limitations period. These two conclusions are not inconsistent, nor is it somehow unfair to Fred's to apply the statute in accordance with its plain language. There is simply no basis under South Carolina law to attribute a dismissal by the EEOC to SHAC, because South Carolina requires that the dismissal be *by its own agency*. Accordingly, we reject Fred's claim that Whitten's action was not timely filed.

## C.

Finally, we consider the assertions that judicial estoppel should bar Whitten's claims. Fred's first contends that Whitten should be judicially estopped from pursuing her claims because she failed to disclose this action in her personal bankruptcy filings.

Whitten disclosed the possibility of a lawsuit in her bankruptcy petition filed on October 26, 2006. *See* J.A. 163 ("Debtor possibly could file a Sexual Harassment Lawsuit against Fred's and be awarded a settlement. (Case is being evaluated for merit right now and thus has not been filed yet. Debtor's attorney is Mary McCormick))." The bankruptcy trustee abandoned all scheduled assets on December 15, 2006, and Whitten commenced this action about six weeks later, on February 2, 2007. The bankruptcy court, however, did not

issue its order discharging Whitten and closing the case until February 26, 2007, and Whitten did not inform the court that the lawsuit had been filed.

"Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996) (internal quotation marks omitted). While "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks and alteration omitted), in this circuit we generally require the presence of the following elements:

> First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. The position at issue must be one of fact as opposed to one of law or legal theory. Second, the prior inconsistent position must have been accepted by the court. Lastly, the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage. This bad faith requirement is the determinative factor.

*Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (citations and internal quotation marks omitted).

Judicial estoppel has often been applied to bar a civil lawsuit brought by a plaintiff who concealed the existence of the legal claim from creditors by omitting the lawsuit from his bankruptcy petition. *See, e.g.*, *Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006) ("All six appellate courts that have considered this question hold that a debtor in bankruptcy who denies owning an asset, including a chose in action or

other legal claim, cannot realize on that concealed asset after the bankruptcy ends."). In this case, however, Whitten did not conceal or deny owning an asset. To the contrary, she informed the trustee and her creditors of her potential claims against Fred's. Even if Whitten should have supplemented her bankruptcy pleadings after she actually filed this action, her initial disclosure of the claims precludes us from finding that she acted in bad faith. Accordingly, we reject this aspect of the judicial estoppel claim. *See Zinkand*, 478 F.3d at 638 (noting that bad faith is "the determinative factor" of a judicial-estoppel analysis (internal quotation marks omitted)).

Fred's also argues that Whitten should be estopped because she seeks to recover damages for certain medical expenses that were discharged in bankruptcy. This argument is without merit. Whitten's position in this action is that Fred's is liable for medical expenses she incurred that would otherwise have been covered by the insurance she lost when she was constructively discharged. There is nothing inconsistent about Whitten's efforts to discharge her debts, including medical debts, and her contention in this action that Fred's is liable for a portion of her medical expenses. While Whitten may not be able to recover for the medical expenses that were discharged, Whitten presumably continued to incur medical expenses after the bankruptcy case was closed, and she is free to argue that Fred's is liable for those post-bankruptcy medical expenses. We recognize, of course, that some of the medical bills Whitten provided to Fred's during discovery had been discharged in bankruptcy, and that Whitten stated in her deposition that the medical invoices she had provided to Fred's were part of her damages claim. Nothing in the record, however, suggests any bad faith on Whitten's part, and we fail to see how this apparent oversight is sufficient to warrant a remedy as drastic as dismissing her action in its entirety. *See New Hampshire*, 532 U.S. at 750 ("Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." (citation and internal quotation marks omitted)). The district

court on remand will have ample opportunity to sort out the issue at the appropriate time to ensure that any damages sought by Whitten are proper.

### III.

Having rejected each of the additional sustaining grounds asserted by Fred's, we now turn to the merits of Whitten's sexual harassment claims.

### A.

As previously noted, Whitten asserts only *state* law claims against Fred's; she does not assert claims under Title VII. While there are no published opinions from South Carolina's appellate courts applying the substantive protections of the South Carolina Human Affairs Law to a claim of discrimination, the Supreme Court of South Carolina has stated that the act "essentially follows the substantive structure of Title VII" and that Title VII cases "are certainly persuasive if not controlling in construing the Human Affairs Law." *Orr v. Clyburn*, 290 S.E.2d 804, 806 (S.C. 1982). Accordingly, we look to federal law for guidance when considering Whitten's claims.

To proceed on a hostile environment claim, "a plaintiff must show that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." *Ziskie v. Mineta*, 547 F.3d 220, 224 (4th Cir. 2008) (internal quotation marks omitted).

The district court rejected Whitten's claim on the fourth element only, without considering whether her evidence was sufficient to meet the first three elements of her claim. On appeal, Fred's likewise proceeds directly to the fourth element and makes no argument that Whitten cannot establish the first

three elements of her claim. Under these circumstances, it is enough for us to note that Whitten's evidence, which shows that she was subjected to verbal abuse and, most importantly, to physical assaults of a highly sexual and offensive nature, is sufficient to create a question of fact as to the first three elements of her claim. While two days of verbal abuse of the type at issue here could not, in and of itself, support a hostile environment claim, that conduct combined with the physical assaults every day after Whitten began working at the store is sufficiently severe that it reasonably could be viewed as creating an abusive work environment. *See, e.g.*, *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 950 (7th Cir. 2005) ("[C]onduct that is *either* pervasive *or* severe may give rise to a hostile work environment[;] . . . . even one act of harassment will suffice if it is egregious." (internal quotation marks omitted)); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). This appeal therefore turns on the fourth element—whether there is a basis for imputing to Fred's liability for the conduct of store manager Green.

B.

Whether and under what standard an employer may be held liable for sexual harassment depends on whether the harasser was a supervisor or merely a co-worker and on whether the plaintiff suffered a tangible employment action. If the plaintiff's claim is based on the actions of her supervisor, the employer is subject to vicarious liability. If the plaintiff did not suffer a tangible employment action, the employer has available to it an affirmative defense that may protect it from liability or damages. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001). If the plaintiff was

harassed by a co-worker rather than a supervisor, however, the employer is not vicariously liable and can be held accountable only if the plaintiff proves that the employer itself was negligent in failing to take effective action to stop harassment about which it knew or should have known. *See Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333-34 (4th Cir. 2003) (en banc).

The district court concluded that Green was Whitten's co-worker rather than supervisor, and that Fred's was not negligent because Whitten quit before Fred's had any knowledge of her complaints. On appeal, Whitten contends that Green was her supervisor and that she suffered a tangible employment action, such that Fred's is vicariously liable for the harm caused by Green's conduct. Whitten also argues that even if this court were to conclude that she did not suffer a tangible employment action, there remain genuine questions of fact regarding the *Faragher/Ellerth* affirmative defense. Finally, Whitten argues that even if Green is properly viewed as her co-worker, there are likewise questions of fact as to whether Fred's itself was negligent in handling her complaints that preclude the granting of summary judgment.

(1)

We turn first to the question of whether Green was Whitten's supervisor or co-worker. The Supreme Court in *Faragher* and *Ellerth* held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 807; *see Ellerth*, 524 U.S. at 765. The Court, however, gave no indication of the scope or type of authority an employee must have to qualify as a supervisor.

The district court concluded that Green was Whitten's co-worker rather than supervisor because Green lacked the authority to fire, promote or demote, or otherwise make deci-

sions that had an economic effect on Whitten. The district court's list of actions that Green did not have the authority to take largely tracks what courts generally view as "tangible employment action[s]." *See Ellerth*, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Matvia*, 259 F.3d at 266 ("Examples of tangible employment action include discharge, demotion, or undesirable reassignment." (internal quotation marks omitted)). The district court thus effectively equated supervisory status with the ability to take tangible employment actions. Under the district court's analysis, if the harasser lacks the authority to take tangible employment actions, then the harasser cannot be the plaintiff's supervisor. We agree with Whitten that the district court erred by viewing the ability to take tangible employment actions as dispositive of supervisory status.[5]

We considered the supervisor question in *Mikels v. City of Durham*, 183 F.3d 323 (4th Cir. 1999), a case involving a police officer's claim she was harassed by a higher-ranking member of the squad. Drawing from a portion of the Supreme Court's discussions in *Faragher* and *Ellerth* of the policy- and common-law-based reasons why and under what circumstances employers should be held vicariously liable for discriminatory acts of supervisory employees, *see Faragher*, 524 U.S. at 801-04, *Ellerth*, 524 U.S. at 760-64, we held that when considering whether a harasser was the plaintiff's supervisor, the critical question was "whether the particular conduct was aided by the agency relation," *Mikels*, 183 F.3d at 332 (internal quotation marks omitted). "The determinant is whether as a practical matter [the harasser's] employment relation to the victim was such as to constitute a continuing threat to her employment conditions that made her vulnerable to and

---

[5]The EEOC filed an amicus brief in support of Whitten and argues that the district court's definition of supervisor is too narrow.

defenseless against the particular conduct in ways that compa-
rable conduct by a mere co-worker would not." *Id.* at 333.

   The analysis of the issue in *Mikels*, however, made it clear
that the absence of the ability to take tangible employment
actions does *not* foreclose the possibility that the harasser is
the plaintiff's supervisor. After noting that tangible employ-
ment actions are always aided by the agency relation and that
"harassment by a fellow-employee having no authority of any
kind over the victim never can be found 'aided by the agency
relation,'" *id.* at 332, we explained that:

> Between these extremes, there remains otherwise
> actionable harassment that, though it does not culmi-
> nate in tangible employment action, is nevertheless
> "aided by the agency relation," *as that may be dem-
> onstrated by other features of the employment rela-
> tions* between harasser, victim, and employer and the
> particular circumstances of its occurrence. . . .
> [Vicarious liability] can only arise from the conduct
> of an employer having *some measure of supervisory
> authority over the victim*; it cannot arise from the
> conduct of a mere co-worker, one with no form of
> authority.

*Id.* (emphasis added). *Mikels* thus recognized that harassment
by employees with only "some measure of supervisory
authority" could be aided by the agency relation, such that the
imposition of vicarious liability would be appropriate. The
*Mikels* court then looked to the "other features of the employ-
ment relations" to conclude that the harasser in *Mikels* could
not be viewed as the plaintiff's supervisor. The harasser did
not have the ability to take tangible employment actions and
had "at best minimal" authority over the plaintiff that "at most
. . . involve[d] the occasional authority to direct her opera-
tional conduct while on duty." *Id.* at 334. If the authority to
take tangible employment actions were dispositive, there
would have been no reason for the *Mikels* court to discuss the

area "between the[ ] extremes," *id.* at 332, or to consider whether the authority actually possessed by the harasser was sufficient to support the imposition of vicarious liability.

Our decision in *Howard v. Winter*, 446 F.3d 559 (4th Cir. 2006), likewise makes it clear that supervisory status is not determined solely by the ability to take tangible employment actions. While noting that the ability to take such actions is the "most powerful indication of supervisory status," *id.* at 566, we went on to consider what other authority the harasser had over the plaintiff. Finding that the harasser had "only an occasional authority—shared with the other fifty-four staff members—to direct [the plaintiff's] operational duties," we ultimately rejected the plaintiff's claim the harasser was her supervisor for purposes of her Title VII claim. *Id.*

Under *Mikels* and *Howard*, then, the existence of authority to take tangible employment action would establish that Green was Whitten's supervisor, but the absence of that authority does not establish that Green was merely her co-worker.[6] We therefore look to the "other features of the employment relations" to determine whether Green qualifies as Whitten's supervisor. *Mikels*, 183 F.3d at 332.

---

[6]We also note that making supervisory status dependent on the authority to take tangible employment actions would be inconsistent with the outcome in *Faragher*. The plaintiff in that case complained about the actions of two supervisors, Bill Terry and David Silverman, only one of whom had the authority to take tangible employment actions. *See Faragher*, 524 U.S. at 781 (explaining that Terry had "authority to hire new lifeguards (subject to the approval of higher management), to supervise all aspects of the lifeguards' work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline," while Silverman was "responsible for making the lifeguards' daily assignments, and for supervising their work and fitness training"). The Supreme Court nonetheless treated both Terry and Silverman as supervisors and held the City employer vicariously liable for the actions of Terry and Silverman. *See id.* at 808-10.

Preliminarily, we note that Green's title—store manager—seems to strongly suggest that he had significant authority over Whitten, an assistant store manager. While the parties' titles may not be dispositive, "the harasser's formal rank vis-à-vis that of the victim in the particular employment hierarchy . . . is of critical and sometimes decisive evidentiary importance." *Id.* at 331-32. Except for the days when district manager Eunice was present in the store,[7] Green was the highest ranking employee in the Belton store, and Green was in fact the highest ranking employee in the store on the two days that Whitten worked there. Moreover, the evidence establishes that Green directed Whitten's activities, giving her a list of tasks he expected her to accomplish; that Green controlled Whitten's schedule; and that Green possessed and actually exercised the authority to discipline Whitten by giving her undesirable assignments and work schedules. Finally, while it is not dispositive, it is worth noting that both Green and Whitten believed that Green was Whitten's supervisor.

In our view, these facts point clearly to the conclusion that Green was Whitten's supervisor. Green usually was the highest ranking employee in the store, which meant that there typically was no one superior to Green to provide a check on his behavior. The level of authority Green had and exercised over Whitten was significant—much more than the minimal and occasional authority at issue in *Mikels* or the shared and occasional authority present in *Howard*. Unlike a mere co-worker, Green could change Whitten's schedule and impose unpleasant duties on a whim. And he in fact did so, making her stay late to clean the store and directing her to work on a Sunday that was supposed to be her day off. Green therefore had power and authority that made Whitten vulnerable to his conduct "in ways that comparable conduct by a mere co-worker would not." *Mikels*, 183 F.3d at 333. Green's authority over Whitten thus aided his harassment of her and enabled him to

---

[7]The Belton store was Eunice's "home store as district manager." J.A. 245. Eunice was in the Belton store "at least every other Monday." *Id.*

create a hostile working environment. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 125 (2d Cir. 2003) (concluding that mechanic-in-charge was plaintiff's supervisor even though he lacked the authority to take tangible employment actions: "Not only did he direct the particulars of each of Mack's work days, including her work assignments, he was the senior employee on the work site. He therefore possessed a special dominance over other on-site employees, including Mack, arising out of their remoteness from others with authority to exercise power on behalf of Otis. There was no one superior to Connolly . . . whose continuing presence might have acted as a check on Connolly's coercive misbehavior toward other Otis employees there.").

Pointing to language in *Mikels*, however, Fred's contends that Green was not Whitten's supervisor because Whitten felt free to tell him not to touch her again. *See Mikels*, 183 F.3d at 334 ("Mikels, by her own testimony, rebuffed [the harasser] in an obscenity and profanity-laced outburst . . . , rejected his immediately proffered apology, and the next day filed a formal grievance against him. That is not likely the conduct of one 'reluctant to accept the risks of blowing the whistle on a superior,' but more naturally the conduct of one who thinks of her harasser as merely a fellow-employee from whose unwelcome conduct she is free to walk away or whom she can 'tell where to go.'" (quoting *Faragher*, 524 U.S. at 803)). We disagree.

Preliminarily, we note that while Whitten did tell Green not to touch her again, the evidence as a whole very clearly establishes that she did *not* feel free to tell Green where to go. The evidence suggests that Whitten was afraid of Green—she was so concerned about being alone with him in the stock room that she pretended not to hear his request, and, after talking to Eunice, she quit her job rather than risk working with Green again. Whitten's response to the harassment is therefore in no sense equivalent to the plaintiff's response in *Mikels*. Moreover, *Mikels* makes it clear that the victim's

response to the harassment is important primarily in close cases:

> [W]here the level of authority had by a harasser over a victim—hence her special vulnerability to his harassment—is ambiguous, the tip-off may well be in her response to it. Does she feel free to 'walk away and tell the offender where to go,' or does she suffer the insufferable longer than she otherwise might?

*Mikels*, 183 F.3d at 334. We do not believe the supervisory question in this case is a close one, and we see nothing in Whitten's response to Green's conduct that raises any triable question about Green's status as her supervisor.

Accordingly, we conclude that Green, as matter of law, was Whitten's supervisor for purposes of her sexual harassment claims under the South Carolina Human Affairs Law. Because Green was Whitten's supervisor, Fred's is subject to vicarious liability for Green's conduct, which makes it unnecessary for us to consider whether Whitten's evidence would have been sufficient to establish negligence on the part of Fred's in failing to prevent Green's actions.

(2)

That Fred's is *subject to* vicarious liability, however, does not mean that liability is automatic. If Whitten suffered no tangible employment action, Fred's may

> raise an affirmative defense to the imputation of liability if it can demonstrate, by a preponderance of the evidence, that (1) it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportuni-

ties provided by the employer or to avoid harm otherwise.

*White v. BFI Waste Servs., LLC*, 375 F.3d 288, 299 (4th Cir. 2004) (internal quotation marks omitted); *see Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

"A tangible employment action constitutes a significant change in employment status. . . ." *Ellerth*, 524 U.S. at 761. While tangible employment actions often have an economic effect—for example, "hiring, firing, [or] failing to promote," *id.*—that is not a requirement, given that actions such as "reassignment with significantly different responsibilities" may also amount to tangible employment actions, *id.*; *see also Matvia*, 259 F.3d at 266.

Whitten contends that the actions giving rise to her hostile environment claim—the changes in her work schedule, assignment of unpleasant tasks as punishment, the verbal and physical abuse—amount to tangible employment actions. We disagree. None of these actions inflicted economic harm on Whitten, nor did they involve sufficient changes to her professional responsibilities to effect a significant change in her employment status. While Green's actions made Whitten's job difficult and more than unpleasant, his actions simply did not create a significant change in Whitten's *status* as assistant manager. *See Reinhold v. Virginia*, 151 F.3d 172, 174-75 (4th Cir. 1998) (concluding that assignments of extra work, inappropriate work assignments, and denial of the opportunity to attend a professional conference did not amount to tangible employment actions).

A closer question, however, is presented by Whitten's claim that she was constructively discharged and that the constructive discharge qualifies as a tangible employment action. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial

purposes." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004). That is, "a prevailing constructive discharge plaintiff is entitled to all damages available for formal discharge." *Id.* at 147 n.8. When the constructive discharge claim arises in the context of a hostile-environment lawsuit, the plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* at 147.

A constructive discharge, however, does not always qualify as a tangible employment action. As the Court explained in *Suders*,

> harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. Unlike an actual termination, which is *always* effected through an official act of the company, a constructive discharge need not be. A constructive discharge involves both an employee's decision to leave and precipitating conduct: The former involves no official action; the latter, like a harassment claim without any constructive discharge assertion, may or may not involve official action.

*Id.* at 148. The Court held that only constructive discharges that are precipitated by an official act qualify as tangible employment actions; if "an official act does not underlie the constructive discharge, the *Ellerth* and *Faragher* analysis . . . calls for extension of the affirmative defense to the employer." *Id.* Whether Fred's may assert an affirmative defense to Whitten's claims thus turns on whether Whitten's evidence is sufficient to support her claim of constructive discharge and, if so, whether the constructive discharge was precipitated by an official act within the meaning of *Suders*.

(i)

In this circuit, an employee is constructively discharged "if an employer deliberately makes the working conditions of the employee intolerable in an effort to induce the employee to quit." *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353-54 (4th Cir. 1995) (internal quotation marks omitted). A constructive-discharge plaintiff must therefore "allege and prove two elements: (1) deliberateness of the employer's actions and (2) intolerability of the working conditions." *Id.* at 1354 (internal quotation marks omitted). To prove deliberateness, the plaintiff must prove "that the actions complained of were intended by the employer as an effort to force the employee to quit." *Id.* (internal quotation marks omitted).[8] While we find it to be a close question, we believe Whitten's evidence is sufficient to create a question of fact as to whether she was constructively discharged.

---

[8]Our requirement that the plaintiff prove the employer intended to force the plaintiff to quit is arguably in some tension with the Supreme Court's decision in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). In *Suders*, the Court described constructive discharge as "a 'worse case' harassment scenario, harassment ratcheted up to the breaking point," *id.* at 147-48, and held that a constructive-discharge plaintiff must prove that her working conditions were "so intolerable that a reasonable person would have felt compelled to resign," *id.* at 147. Because there is no requirement that a plaintiff in a routine hostile-environment case show that the employer intended to force her to quit, it could be that, under *Suders*, deliberateness on the part of the employer would not be required to show the "'worse case' harassment scenario" that is constructive discharge. We have, however, continued to apply the deliberateness requirement to constructive-discharge claims since *Suders* was decided. *See Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (involving constructive-discharge claim asserted under the Americans With Disabilities Act). We believe that circuit precedent thus prevents us from considering Whitten's assertion that deliberateness is no longer an element of a constructive discharge claim. *See, e.g.*, *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 n.2 (4th Cir. 2002) ("[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting *en banc* can do that." (internal quotation marks omitted)).

Critical to our analysis of this question is Eunice's response to Whitten's complaints about Green. According to Whitten's evidence, she told Eunice about all of Green's actions, including the physical assaults. Eunice's response was to dismiss the matter out-of-hand, telling Whitten that she was over-reacting and that she should go to work that morning as scheduled. A reasonable person could certainly find intolerable a working situation where a corporate official is utterly unconcerned about sexually-tinged physical assaults inflicted on a subordinate by a supervisor. And as to the deliberateness requirement, we have never "insisted on smoking gun evidence of employer intent." *Martin*, 48 F.3d at 1354 (internal quotation marks omitted). Instead, "an employer's intent can be proved by inference," *id.* (internal quotation marks omitted), through evidence, for example, showing that "the employer failed to act in the face of known intolerable conditions," *id.* (internal quotation marks omitted), or that the "employee's resignation was the reasonably foreseeable consequence of the employer's conduct," *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132-33 (4th Cir. 1995). Eunice's response, and his failure to offer Whitten any amount of protection from further assaults by Green, could reasonably be viewed by a fact-finder as a failure to act in the face of known intolerable conditions, and Whitten's resignation could be viewed as a reasonably foreseeable consequence of the combination of Green's conduct and Eunice's lack of concern for Whitten's safety. Accordingly, we conclude that there is a question of fact as to whether Whitten was constructively discharged.

(ii)

As discussed above, Fred's is entitled to assert the *Faragher/Ellerth* affirmative defense to Whitten's constructive discharge claim unless the discharge was precipitated by an "official act." *Suders*, 542 U.S. at 148. The *Suders* Court explained that an official act is the equivalent of a tangible employment action, *see id.* at 149, defining it as "an employer-sanctioned adverse action officially changing [the

plaintiff's] employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions." *Id.* at 134.

To provide guidance on what constituted an official act precipitating a constructive discharge claim, the Supreme Court discussed two Circuit Court opinions that it believed properly applied the "untangled approach we approve in this opinion." *Id.* at 149. The first case was *Reed v. MBNA Marketing Systems, Inc.*, 333 F.3d 27 (1st Cir. 2003), in which the plaintiff asserted she was constructively discharged because of her supervisor's "repeated sexual comments and an incident in which he sexually assaulted her." *Suders*, 542 U.S. at 150. The Supreme Court concluded that the First Circuit in *Reed* properly allowed the employer to assert the *Faragher/Ellerth* affirmative defense because "the supervisor's behavior involved no official actions." *Id.* at 150. "[T]he supervisor's conduct in Reed 'was exceedingly unofficial and involved no direct exercise of company authority'; indeed, it was 'exactly the kind of wholly unauthorized conduct for which the affirmative defense was designed.'" *Id.* (quoting *Reed*, 333 F.3d at 33).

The second case discussed by the Supreme Court was *Robinson v. Sappington*, 351 F.3d 317 (7th Cir. 2003). In *Robinson*, the plaintiff was sexually harassed by a judge for whom she worked. After her complaint, the presiding judge, apparently in an attempt to protect the harassing judge rather than the plaintiff, transferred the plaintiff to another judge. The presiding judge warned the plaintiff, however, that "her first six months [with the new judge] probably would be hell," and that it was in the plaintiff's "best interest to resign." *Robinson*, 351 F.3d at 324 (internal quotation marks omitted). The Supreme Court agreed with the Seventh Circuit's determination that the employer in *Robinson* could not assert the *Faragher/Ellerth* affirmative defense, because the "plaintiff's decision to resign . . . resulted, at least in part, from the pre-

siding judge's official action in transferring her to a judge who resisted placing her on his staff." *Suders*, 542 U.S. at 150 (internal quotation marks and alterations omitted).

The Supreme Court explained that "[t]he courts in *Reed* and *Robinson* properly recognized that *Ellerth* and *Faragher*, which divided the universe of supervisor-harassment claims according to the presence or absence of an official act, mark the path constructive discharge claims based on harassing conduct must follow." *Id.* Following the path marked by *Reed* and *Robinson*, we conclude that no official action precipitated Whitten's constructive discharge claim and that Fred's is therefore entitled to assert the *Faragher/Ellerth* affirmative defense on remand.

It is clear that, in accordance with *Reed*, Green's actions cannot be considered an official act. Like the conduct at issue in *Reed*, Green's conduct in harassing and assaulting Whitten was unofficial and unauthorized. Because Green's actions do not constitute an official act, the conduct cannot preclude Fred's from asserting the affirmative defense. Nonetheless, as indicated by *Robinson*, an employer's response to a harassment claim is relevant when determining whether an official act precipitated a constructive discharge. Thus, the question is whether Eunice's response to Whitten's complaint amounts to an official act. We believe the answer to that question must be "no."

As the Court explained in *Suders*, an official act is an "employer-sanctioned adverse *action officially changing her employment status* or situation." *Suders*, 542 U.S. at 134 (emphasis added). Whereas the presiding judge in *Robinson* transferred the plaintiff to a new position, thus changing the plaintiff's employment situation, Eunice took no comparable step. Eunice's action, properly viewed, amounts to a failure to act—a failure to stop Green's conduct, and a failure to take any steps to protect Whitten from Green. Regardless of the wisdom or adequacy of Eunice's response, Eunice did nothing

to change Whitten's employment status. Eunice's actions, therefore, cannot be viewed as an official act within the meaning of *Suders*. Because there was no official act that precipitated Whitten's constructive discharge, Fred's may assert the *Faragher-Ellerth* affirmative defense.

(3)

While we conclude that Fred's is entitled to assert the *Faragher-Ellerth* affirmative defense on remand, we reject its contention that the evidence establishes the existence of the defense as a matter of law.

To establish the defense, Fred's must prove that "it exercised reasonable care to prevent and correct promptly any harassing behavior" and that Whitten "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *White*, 375 F.3d at 299 (internal quotation marks omitted). Although Fred's had in effect a policy against discrimination and harassment, the mere existence of a policy does not automatically "satisfy the employer's burden. The employer must act reasonably, and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual." *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999). Given Eunice's response to Whitten, there is a question of fact as to whether Fred's acted reasonably.

Moreover, even though Whitten told Greenville store manager Cox that she was going to quit in a conversation that took place before Whitten reported Green's conduct to Eunice, that does not mean, as Fred's insists, that Whitten quit before Fred's knew about her complaints. Cox was not in Whitten's chain of command, and Whitten's intention to quit did not somehow become irrevocable once she voiced the thought to Cox. If Eunice's response to Whitten had been different, Whitten might well have decided that she did not need to quit.

Under these circumstances, it is up to a fact-finder to determine the reasonableness of Whitten's actions.

IV.

To summarize, we conclude that Whitten properly exhausted the state administrative remedies because the charge of discrimination that she filed with the EEOC was actually filed with the South Carolina Human Affairs Commission when it was forwarded to the state agency by the EEOC. The state agency never issued a dismissal of Whitten's charge, so Whitten's lawsuit, which was filed within one year of the discriminatory conduct, was timely filed. And because Whitten disclosed her potential claim against Fred's in her bankruptcy petition, judicial estoppel does not preclude her from pursuing her claims against Fred's.

On the merits of her claims, we conclude that Whitten's evidence is sufficient to require a trial on her sexual harassment claims, including her claim that she was constructively discharged. Although we conclude that Green was Whitten's supervisor as a matter of law, such that Fred's is subject to vicarious liability for Green's conduct, there was no tangible employment action and no official act precipitating the asserted constructive discharge. On remand Fred's will therefore be entitled to assert the affirmative defense to liability and damages as set forth by the Supreme Court in *Faragher* and *Ellerth*.

Accordingly, for the foregoing reasons, we hereby vacate the district court's order granting summary judgment to Fred's, and we remand for trial on Whitten's claims.

*VACATED AND REMANDED*